# THE GLYMONT IMPROVEMENT AND EXCURSION COMPANY *vs.* WASHINGTON N. TOLER.

*Corporations—Acceptance of Charter—Changing one Corporation with.
Another—Acquiescence of Shareholder—Surrender of Stock—Organization without the State.*

Where a corporation is formed under the general law, no further proof is required to show that the persons who signed the articles and applied for the charter have accepted the same, than their compliance with the provisions of the statute.

The stockholders of a certain corporation, instead of amending their charter in the manner agreed upon by all of them, including the defendant, applied for and obtained a new charter, identical in terms with the proposed amendment, and differing but little from the old charter. In adopting the new charter, the trustees were directed to convey the property of the old company to the new one upon the latter's assuming all liabilities and issuing to each shareholder of the former company a certificate of stock in the new company equal to his paid up stock in the old company. The new company was first formally organized in the District of Columbia, but subsequently held meetings, &c., in Maryland. Defendant, the owner of certain shares of stock in the old company, refused to exchange them for stock in the new company, but he attended stockholders' meetings, took part in the discussions, and objected to the exchange of his stock on account of his opposition to some of the officers of the new company. *Held,*

1st. That the transaction in this case did not amount to a sale of the property of one corporation to another foreign corporation in exchange for its stock.

2nd. That although the new company may have been first organized in the District of Columbia, yet a subsequent organization in this State and operations under the charter render the same valid.

3rd. That by his conduct the defendant must be treated as having assented to the acceptance of the new charter by the stockholders, with the knowledge that such acceptance was upon the condition that certificates of stock under such charter were to be issued in lieu of the former stock.

4th. That the defendant should be ordered to surrender his certificate of stock in the old company, and accept in lieu thereof a like certificate in the new company.

Neither the directors nor a majority of the stockholders of a corporation have the power to make fundamental changes in the charter, inconsistent with the objects for which it was granted; nor have they the power, upon the dissolution of the company, to sell its property to another corporation and compel the shareholders to take stock in that company.

Appeal from the Circuit Court for Charles County. The bill of complaint in this cause, filed by The Glymont Improvement and Excursion Company against the appellee, set forth the following facts : On November 21, 1883, The Upper Glymont Improvement and Excursion Company was incorporated under the general law, and purchased upwards of one thousand acres of land, lying on the Potomac River, in Charles County. In March, 1888, this company, for the purpose of amending its charter by changing its name from " The Upper Glymont, etc., Co." to " The Glymont, etc., Co.," and to make more explicit its powers, called a general stockholders' meeting, at which the new charter was agreed upon by a vote of more than two-thirds of the shares of stock. The bill further alleged that it was agreed by the defendant that all the stockholders of the old company should surrender their stock to the new company, and receive in lieu thereof the stock of the new company in shares and amounts equal to the old company's stock held by them ; that all of the shareholders of the former company accepted stock in the new company, except the defendant, who, notwithstanding his assent to said transaction, contended and openly proclaimed that the plaintiff had no legal existence and no title to the property in question, because the surrender of the old company's charter and the transfer of its property to the new one, was not made with the unanimous consent of the stockholders of the former company. It was averred that the conduct of the defendant threw a cloud upon the plaintiff's title to the property, and prevented them from managing the same advantageously and from selling the remaining shares of the stock. The prayer of the bill was that the defendant be decreed to bring the certificate of stock

in the old company held by him to the plaintiff to be cancelled, and accept a certificate for a like number of shares in the new company, and that he be enjoined from transferring the shares then held by him, etc.   The defendant denied that he had assented to the surrender of the old charter and the acceptance of the new one.   The purport of the evidence upon this point is set forth in the opinion of the Court.   The Circuit Court for Charles County (BROOKE, J.), made a decree dismissing the bill of complaint.

The minutes of the Upper Glymont Company showed that a special meeting of the stockholders was held on May 20, 1886, at which the defendant submitted an amended charter almost identical with that subsequently adopted ; and that at a meeting of the stockholders at Glymont on April 7, 1888 (the defendant, however, not being present), the following preamble and resolutions were unanimously adopted, more than two-thirds of the shares of stock being voted : " *Whereas*, a special meeting of the stockholders of the Upper Glymont Imp. and Ex. Co. was held at Glymont, Md., May 20, 1886, for the purpose of considering certain proposed amendments to the charter ; and, *whereas*, at a special meeting of the trustees, held June 10, 1886, a committee appointed at the special meeting of stockholders held in May, reported that they had submitted the suggested amendments to Judge Frederick Stone, who had approved the same, but recommended that, instead of amending the present charter, it would be better to draft and adopt a new one ; and, *whereas*, in compliance with said suggestion, a new charter was prepared but never fully executed ; and, *whereas*, on the 29th of December, 1887, a special stockholders' meeting was held at Glymont, Md., when said new charter and the suggested amendments were duly considered and concurred in ; and, *whereas*, the necessity and the desirability of amending and changing the charter so long entertained, and so frequently expressed by the holders of stock represented at each meeting, still exists ; therefore, *resolved*, that the stockholders of the Upper Glymont Imp. and Ex. Co.,

being lawfully called and duly assembled, do concur in the previously expressed desire to amend and change the charter of the company, and do hereby adopt the new charter presented for our consideration. *Resolved,* that the trustees are hereby authorized and instructed to convey the land and all its betterments and improvements to the Glymont Improvement and Excursion Company ; provided said company shall assume all debts and liabilities whatsoever of the Upper Glymont Imp. and Ex. Co., and agree to issue to each stockholder of this company certificates of stock in the new company equal to the amount of paid up stock owned by him in the old company."

The first meeting of the charter members of the new company was held at Glymont, but a quorum not being present, an adjourned meeting was held in Washington, D. C., on April 9, 1888, at which officers for the ensuing year were elected, and the offer of the Upper Glymont Co. to transfer its property upon the above-mentioned terms accepted. In April, 1889, and in the following years, the annual meetings of the new company were held at Glymont, and the officers then elected.

The cause was argued before ROBINSON, C. J., BRYAN, MCSHERRY, FOWLER, BRISCOE, PAGE and BOYD, JJ.

*Marion Duckett,* for the appellant.

If we consider the purposes for which the plaintiff obtained its charter, the circumstances and manner under and by which it was obtained, we think there was no occasion for its acceptance as though they were acquiring corporate franchises from the State for the first time. There was simply, solely and purely an attempt to amend the old charter, and the only question really is, or was, whether this was done with the express or implied consent of the stockholders of the old company.

When a particular charter is granted after having been applied for acceptance, may be presumed from such *previous*

*application.* Indeed it would seem that no acceptance would be required in the latter case, since the consent of the grantees was given in advance. *Middlesex & Co.* v. *Davis*, 3 Metc. 138; *Smead* v. *R. R. Co.*, 11 Ind. 104; *Hammond* v. *Straus*, 53 Md. 12. Applying the facts to the last principle, what object could there be in requiring the incorporators, S. A. H. McKim and others, to manifest other evidence of their acceptance of the certificate of incorporation when they were the individuals *who petitioned for* the said certificate, signed, sealed, acknowledged it, and presented it for the approval or certification of the Circuit Court.

Could the Upper Glymont Co. have its charter amended in the manner and to the extent it did without the consent of the defendant or the unanimous vote of its shareholders? I contend it could. *Morawetz Corp.*, secs. 53, 198; *Cook on Stockholders*, sec. 499. The cases announcing the doctrine that the unanimous consent of the stockholders must be had to an amendment of the charter, or indeed, surrender of the charter, are cases in which it appeared to the Courts that the amendments or the surrender, very seriously jeopardized the interests of these dissenting stockholders, as by inserting in the charter some enterprise involving a different or greater risk, or large expenditures of money, or great uncertainty in the feasability of the plan itself, or consolidation with other companies with a view to saddle more debt upon the old company, or change its original purpose, or obliteration of its stock by merger, and the like; (*Beach*, vol. 1, secs. 41 and 42; 36 Md. 491; *Morawetz*, secs. 77, 79, 80, 82, (1882); but no one of which features do we find involved in the amendment to the charter of the old company, nor can we conceive how the defendant's stock is imperilled or rendered less valuable by reason of the change, or any clause or article in the new charter. The name is the same with the word upper out; purposes and object, same; place, same; capital stock, same; duration, same; property, same; directors, same; debts, same; and new stock issued for the old.

Where the amendment is not fundamental, it may be accepted by the majority. *Buffalo and New York City R. R. Co.* v. *Dudley*, 14 N. Y. 336; *Schenectady and Saratoga Plank Road Co.* v. *Thatcher*, 11 N. Y. 102; *Dayton, etc., R. R. Co.* v. *Hatch*, 1 Disney, 84; *Commonwealth* v. *Cullum*, 13 Penn. St. 133; *Cooke*, sec. 499, note 2. Whether an amendment materially changes the corporate plans or not, is a question of law for the Court, upon facts ascertained by the jury. Accordingly, each case is to be decided according to the peculiar circumstances of that case, and no general rules can be laid down which will apply to all cases. *Cooke*, page 485.

There is no doubt that, in law, a stockholder may bind himself in his dealings with a corporation as well by his acts, behavior and remarks, as he could by a formal vote or a written declaration. (*Beach on Corporations*, vol. 1, page 81, sec. 43; *Stokes* v. *Detrick*, 75 Md. 263, *and* 75 Md. 315; *Morawetz*, secs. 79, 80, 82, 1882.) A dissenting stockholder may be estopped from objecting to an amendment by his expressed or implied acquiescence therein, and there are certain circumstances by which his silence will operate as a bar to any subsequent objection. (See also vol. 2, sec. 431, *Beach on Corporations*.) It is not just that a shareholder, knowing an act of the majority to be unauthorized, should lie by and reserve an option to repudiate an act in case of loss, or to enjoy the benefits of it, should it turn out well. Fairness in such cases demands that a dissenting stockholder should make known his dissent immediately, and take the proper steps to restrain the majority from exceeding the powers conferred upon them. And if a shareholder fails to take the trouble to inquire into the affairs of the corporation, of which he is a member, or to attend its meetings, it seems no more than just that his supineness should be construed as an acquiescence in the proceedings of the majority. (*Morawetz*, sec. 80; *Cook*, secs. 685, 686 and notes.) If we read the citations from the evidence in the 14th paragraph herein, and then consider that the

defendant was a stockholder of the Upper Company during the whole time when the amendments were being discussed and assented to ; when the surrender was actually made ; when the ratification of the charter was had, April 7, 1888, by the votes of the old company; when he has seen and known the plaintiff company to be spending annually hundreds of dollars in paying interest of the $13,000 incumbrances on this property, annual taxes, repairs on its houses; wharves and property generally, details of which are set out in the financial reports of the company, and has never sued them or attempted to restrain them, it is clear that the appellant is entitled to the relief asked for.

*O. D. Barrett* and *Adrian Posey*, for the appellee.

The only possible ground on which the appellant could claim a decree as prayed for, would be on that of an estoppel as against the appellee, Toler; that is, that the appellant company had been led to do what it has in the premises, by reason of the action of the appellee, Toler, before that action was taken. The appellant has totally failed to show by the evidence, that its action has at any time been based upon any prior word, act or deed of the appellee. The appellee took no part in the organization of the appellant company. He never advised it; he took no part in any transfer of property to said company ; he took no part on behalf of the appellant company in advising the acceptance of said property by said company, and said company has never been led by him to do, or leave undone, any act or thing whatever ; and consequently there is no such thing as estoppel in this case.

No corporation can perform any corporate act outside of the jurisdiction of the State or Territory under whose laws the corporation is created, and the organization of a corporation by the corporate members designated to manage the affairs of the company for the first year is a corporate act which must be performed, if at all, within the jurisdiction of the State or Territory under whose laws the corporation is

created.    In support of the above point, counsel for appellee rely upon the following authorities:    1 *Beach on Private Corporations*, secs. 285, 286; *Smith* v. *Silver Mining Co.*, 64 Md. 85; *Miller* v. *Ewer*, 27 Me. 509; *Bank of Augusta* v. *Earle*, 13 Peters 519; *Wood* v. *Hydraulic Co.*, 45 Ga. 35; *Hilles* v. *Parrish*, 14 N. J., Eq. 380·; *Aspinwall* v. *Ohio R. Co.*, 20 Ind., 492; *Freeman* v. *Machias Water Power Co.*, 38 Me., 343; *Ormsby* v. *Vt. Copper Co.*, 56 N. Y. 623; *Merrick* v. *Brainard*, 38 Barbour, 574; *Franco-Texan Land Co.* v. *Laigle*, 59 Tex. 339; *Farmham* v. *Blackstone, Corp.* 1, Sumn. 46; *Day* v. *Newark Mfg. Co.*, 1 Blachf. 628; *Plimpton* v. *Bigelow*, 93 N. Y. 592; *Stephens* v. *Phoenix Ins. Co.*, 41 N. Y. 149; *Merrick* v. *Van Santwood*, 34 N. Y. 298; *Richwald* v. *Com. Hotel Co.*, 106 Ill. 439.

The attempted transfer of the property of the Upper Glymont Improvement and Excursion Company to the Glymont Improvement and Excursion Company failed of its object, in that it was done, if done at all, without any valid or legal consideration.    (*a.*) At the time of the passage of this resolution, to-wit, April 7, 1888, the Glymont Improvement and Excursion Company was unorganized, and it then had no officers or agents who could bind the company to give any consideration for the transfer attempted to be made to it.    (*b.*) " Said company to assume all debts and liabilities now due, in consideration of this transfer."    There is here no specification as to what debts and what liabilities the Glymont Improvement and Excursion Company were to assume.    The language is not that said Glymont Improvement and Excursion Company should assume all debts and liabilities of the Upper Glymont Improvement and Excursion Company.    (*c.*) By the insertion of the words "now due," the language is not applicable to the liabilities in general of the Upper Glymont Improvement and Excursion Company, as the majority of the indebtedness of that company, to-wit, a promissory note made in September, 1886, for $8,000, payable in two years from date, had not then become due.

When the property of one corporation is sold to another, no shareholder of the former can be required, without his own consent, to accept the stock of the latter as his share of the proceeds of sale. *Beach on Private Corp.* sec. 359; *Masou* v. *Pewabic Mining Co.*, 133 U. S. 50; *Taylor* v. *Earle*, 8 Hun. 1; *Frothingham* v. *McArdle*, 6 Hun. 366; *McCurdey* v. *Meyer*, 44 Pa. St.

ROBINSON, C. J., delivered the opinion of the Court.

The Upper Glymont Improvement and Excursion Co. was incorporated in 1883, under the general incorporation law, with a capital stock of $25,000, divided into 1,000 shares, of the par value of $25 each. The object of its incorporation was to buy a tract of land on the Potomac River, at or near Glymont, in Charles County, about twenty miles below Washington, and to erect thereon hotels, cottages and other buildings necessary and suitable for a summer resort; also for the purpose of cultivating flowers, growing vegetables and agricultural products.

Soon after its organization the company bought a tract of land called "Upper Glymont," and then it bought another tract, "Lower Glymont," the two tracts containing about one thousand acres. On the property thus purchased it has expended large sums of money in buildings and other improvements, in order to make it an attractive summer resort. After the purchase of the Lower Glymont tract, it was deemed advisable to change the name of the company by leaving out the word "Upper," thus making the name "The Glymont Improvement and Excursion Company;" and also to strike out the clause in the charter forbidding the sale of intoxicating drinks on the property. And for this purpose an amended charter was prepared by Toler, the defendant, then one of the directors, and was acknowledged by him and six other corporators, as required by the Code, before the proper officer, and submitted by him to the stockholders at a special meeting, held 20th May, 1886. It does not appear that any definite action was had in re-

gard to the amended charter at this meeting, but at a meeting of the directors on June 10th, of the same year, the committee on charter reported that they had submitted the amended charter to Judge Stone, one of the Judges of the Circuit Court, as required by the Code ; and that he, whilst being of opinion that the amendments were in conformity with the statute, suggested it might be better to adopt a new charter, and this suggestion was concurred in by the directors.   Instead, then, of amending the charter, articles of incorporation were signed by the directors for the incorporation of "The Glymont Company," and having been duly acknowledged by the parties signing the same, they were submitted to Judge Stone, who thereupon certified that they were in conformity with the provisions of the law authorizing the formation of said corporation ; and on the 17th March, 1888, they were filed for record in the Clerk's office of the Circuit Court for Charles County.   This charter, which is called the new charter, *is identical in terms and provisions with the amended charter* prepared, signed, acknowledged and submitted by the defendant at the stockholders' meeting of May 20th, and it is substantially the same as the charter of 1883, the only alterations being in the name of the company and the omission of the clause forbidding the sale of intoxicating drinks.   The reason for filing new articles of incorporation, instead of an amended charter, was the fact that the whole capital stock had not been taken, and it was deemed best to avoid any trouble that might arise under the 64th sect. of Art. 23 of the Code, which provides that the capital stock of a corporation shall be paid within four years from and after its incorporation, "or such corporation may be dissolved."   After the articles of incorporation had been filed of record, a special meeting of the stockholders was called to be held April 7th, 1888, at Glymont, where the principal office of the company was located ; and at this meeting, the charter, after full consideration, was adopted without a dissenting vote, more than two-thirds of the shares of stock having been voted.

And in adopting the charter it was further resolved, "That the trustees are hereby authorized and instructed to convey the land and all its betterments and improvements to the Glymont Improvement and Excursion Company, provided said company shall assume all debts and liabilities whatsoever of the 'Upper Glymont Improvement and Excursion Company,' and agree to issue to each stockholder of this company certificates of stock in the new company, equal to the amount of paid up stock owned by him in the old company."

There being only two charter members of the new company present, the meeting adjourned to meet at the branch office in Washington, on the 9th April. At this adjourned meeting, held in Washington, the directors formally organized by electing a president and other officers.

The defendant was the owner of 64 shares of stock of the " Upper Glymont Company," and he refuses to exchange this stock for the stock of the " Glymont Company," because the charter of 1888, he says, has never been accepted, and the latter company has no power, therefore, to issue certificates of stock; and, secondly, because it has no right to compel him, a dissenting stockholder, to exchange his stock for the stock of that company.

The acceptance of the charter is necessary, of course, to the corporate existence of every corporation, and for the reason that the corporators are not obliged to assume the responsibilities and discharge the duties imposed by the charter without their consent. It is well settled, however, that it is not necessary, even when the charter is granted by special act of the Legislature, to prove such acceptance by a formal vote of the corporators; on the contrary, it may be inferred from the exercise of corporate acts by them under the charter.

In this case, however, we are not dealing with a charter granted by a special act of the Legislature, but one created under the general incorporation law. And this law provides, in the first place, that any five or more persons who may

desire to form a corporation shall make, sign, seal and acknowledge before some person competent to take the acknowledgement of deeds, a certificate in writing, in which shall be stated, &c.   And then it provides that it shall be the duty of the persons executing the same, to submit it to one of the Judges of the Judicial Circuit within which the principal office shall be located, in order that he may determine whether the certificate is in conformity with the law, " and if he shall so determine, he shall certify his said determination upon said certificate, which shall thereupon be recorded in the office of the Clerk of the Circuit Court for the county in which the principal office of said corporation shall by the terms of the certificate be located."   And then it further provides, " that when the said certificate shall have been recorded, the persons who have signed and acknowledged the same and their successors, shall, according to the objects, purposes, articles, conditions and provisions in said instrument contained, become and be a *body politic and corporate in fact and in law*, by the name stated in such certificate."

So, upon compliance with these provisions, the persons who have signed and acknowledged the articles of incorporation, *thereby become a corporate body*, by the name stated in the articles.   It would be idle, under such circumstances, to require further proof that the corporators had accepted that which they had in express terms applied for, and to obtain which they had complied with all the requirements of the law.

But then, it is said, there must not only be an acceptance of the charter, but the company must be organized in the State where the charter was granted ; and the argument is, that inasmuch as the plaintiff company was organized by the directors in Washington on the 9th April, 1888, there is no proof of their acceptance of the charter and organization of the company in this State.   To this we cannot agree.   There is abundant proof throughout this record of the acceptance and organization of the company in this

State, independent altogether of the organization in Washington. It shows that from 1888, when the company was incorporated, down to the filing of this bill in 1892, the corporators and their successors have exercised corporate rights of every kind under the charter; that they have issued certificates of stock under the seal of the company; that they have expended money in further developing and improving the property; and that a board of directors has been *annually elected by the stockholders* at Glymont, in this State; and that the directors thus elected have controlled and managed all the property and affairs of the company.

The defendant's second contention is equally untenable. We agree that neither the directors nor a majority of the stockholders have the power to make *fundamental changes* in the charter, foreign and inconsistent with the objects and purposes for which it was granted. We agree that they have no power upon the dissolution of the company by the expiration of the time limited in the charter for its corporate existence to sell its assets at a fixed value to another corporation, and compel the shareholders to take stock in that company at a valuation fixed by that company. And we agree, too, that they have no power by their own act to terminate the existence of the corporation and then transfer its property to a corporation in another State, and take in payment therefor stock in the foreign corporation. And it is unnecessary, therefore, to consider the several cases relied on by the counsel for the defendant, in support of these principles. *Mason* v. *Pewabic Mining Co.*, 133 U. S. 50; *Taylor* v. *Earle*, 8 Hun; *Frothingham* v. *McArdle*, 6 Hun. 336; *Morawetz Corp.* 415. It is sufficient to say that these cases and the principles on which they were decided have but little, if any, application to this case. No fundamental changes have been made in the charter of 1883. The objects and purposes of that charter, the property, the capital stock and the number and value of the shares, are all the same as in the charter of 1883, the only changes or alterations being the substitution of "Glymont"

for " *Upper Glymont*," and the omission of the clause forbidding the sale of intoxicating drinks. Nor has there been a *dissolution* of the company, in the sense in which that term is used, either by the expiration of the time fixed in its charter, or from any other cause, nor has there been a sale of its property to another and foreign corporation in exchange for the stock of that corporation.

But even conceding, for the purposes of this case, that the charter of 1888 is to be considered as a new charter in every sense, and that it differs fundamentally from the original charter, the proof shows beyond question, it seems to us, that the defendant, by his own acts and conduct, must be held as having *acquiesced* in the acceptance of the new charter, and this, too, with full knowledge that it had been accepted by the stockholders at the April meeting in 1888, without a dissenting voice, and upon the express condition that the new company should assume the debts of the old company, and issue certificates of stock in lieu of the stock held by the shareholders in the old company—the consideration for which being the transfer of the property from the old to the new company. And although the defendant has refused to exchange his stock, the proof shows that such refusal was not because he had any objections to the charter itself, or its acceptance, for it is identical in terms and provisions with the amended charter which he himself had prepared and signed, but because he objected personally to some of the directors and officers, and also to the management of the company. To more than one witness he expressed his willingness to exchange his stock, provided he could succeed in electing a new board of directors, and when his last effort, in April, 1891, to change the management failed, he wrote to the plaintiff insisting that it should buy his stock at twenty dollars per share, and if it refused he threatened all this unprofitable and, as it seems to us, unnecessary litigation. All this, the proof, we think, fully sustains. The witnesses on the part of the plaintiff, its president, secretary, directors and others, all testify that

the defendant not only attended the stockholders' meeting, held for the purpose of considering the best means of promoting the interests of the company, but took an active part in the discussions. And though he criticised and found fault with the management, he never, either in these discussions or in private conversation with these witnesses, with one of whom, at least—Mr. Bigelow—he was on intimate terms, made any objection to the charter or its acceptance at the stockholders' meeting in 1888. And the proof further shows, that prior to the April election, 1891, for directors, the defendant was active in getting up a ticket in opposition to their existing board; that he suggested to other stockholders the necessity of getting proxies, and contributed to the expense of printing these proxies, and after they had been obtained, he, together with other stockholders, tabulated the vote in order to ascertain whether they had a majority of the shares of stock. And when the election took place at Glymont he attended the meeting, took part in the discussion, was present when the proxies were voted, and afterwards, when the vote was announced, he insisted that the proxies had not been properly counted. This testimony is substantially corroborated by Messrs. Metzger and Porter, the defendant's own witnesses. Mr. Metzger says the defendant attended some of the meetings of the stockholders in Washington, and took part in the discussions, and urged the members to come together, and show more interest in the company, and change the trustees, or file a bill in equity to make the old officers account for their mismanagement. That prior to the annual election in 1891, witness went to defendant's house, and there they made a tabulation of the proxies which had been obtained, in order to ascertain whether they had votes enough to elect a new board of directors, and that the defendant attended the April election and was present when the votes were counted. That in his conversations with the defendant, his objections to the exchange of his stock were on the ground of the management of the

company and his opposition personally to some of the directors and officers, and that he had expressed his willingness to make the exchange, provided he could succeed in electing a different board.

In addition to this oral testimony, the defendant, in a letter to Mr. Kefauver, dated Jan. 21st, 1889, says: "I have just attended a large gathering of the stockholders of the Glymont Company," and "as a fellow stockholder," wants to know whether Mr. Kefauver intends to press the collection of his mortgage of $8,000 on the property belonging to the Glymont Company, as was announced at "*our meeting.*" Mr. Kefauver was at that time a *stockholder in the plaintiff company*, and defendant addresses him as a "*fellow stockholder*," and the meeting which he had just attended was a meeting of the stockholders of that company, and which he refers to as "*our meeting.*" And in a subsequent letter, of June 10th, 1891, after the April election, at which he had failed in turning out the old directors, addressed to the plaintiff, the defendant insists that the company shall buy his stock at twenty dollars per share, or take the consequences of an expensive litigation and the exposure of the management of the affairs of the company.

In answer to all this, the defendant, whilst admitting that he had attended the stockholders' meetings and had taken part in the discussions, says that he did so at the request of the stockholders and for the purpose of protecting his own interests as a stockholder in the old company, and that he never assented to or acquiesced in the acceptance of the charter of 1888. But his claims as a *dissenting stockholder* are not to be adjudged and determined by his *mental reservations*, but by his own *acts and conduct*, and by these acts he must be considered and treated as having assented to the acceptance of the new charter by the stockholders, and with the knowledge that such acceptance was based upon the condition that the plaintiff should issue certificates of stock to the shareholders under the charter of 1888, in lieu of the stock held by them. And this refusal to exchange

his stock was not because he had any objections to the new charter, which is identical in its terms and provisions with the amended charter which he himself had prepared and submitted to the stockholders in 1886. So there is no ground upon which the defendant's contention can be sustained.

> *Decree reversed and cause remanded in order that a decree may be passed as prayed.*